/AC

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHARLES BROWN, BILLY ROCKETT, ROBERT JONCEK, HERBERT WHITESIDE, CLEARCHIE CROOKS, LUTHER REED, and JOHNNIE ROLLAND, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | No. 03 C 3921 Judge Joan H. Lefkow |
| GES EXPOSITION SERVICES, INC., its subsidiary, affiliate, and parent companies, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 714, ROBERT HOGAN, WALTER FAREJ, JOHN GILMORE, and T.J. McGARVEY, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Charles Brown, Billy Rockett, Herbert Whitehead,[1] Clearchie Crooks, Luther Reed, and Johnnie Rolland filed this action against defendants GES Exposition Services, Inc. ("GES"), the International Brotherhood of Teamsters, Local 714 ("Local 714"), Robert Hogan, Walter Farej, John Gilmore, and T. J. McGarvey, alleging claims of racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-1 *et seq.*, and 42 U.S.C. § 1981.[2]  Before the court are defendants' motions for summary judgment.  For the reasons stated below, the court grants defendants' motions.

---

[1] Although the caption refers to Herbert Whiteside, both parties refer to this plaintiff as Herbert Whitehead. The court will do the same.

[2] Plaintiffs have withdrawn Robert Joncek's claims of retaliation and discrimination. *See* Plaintiffs' Response to Motions for Summary Judgment at 28 (moving to dismiss with prejudice counts III, IV, and V of the amended complaint).

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## LOCAL RULE 56.1

The Local Rules of the Northern District of Illinois provide detailed instructions as to how litigants should approach their summary judgment motions and responses. The purpose of Local Rule 56.1 is to isolate legitimately disputed facts and assist the court in its summary judgment determination. *See Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (stating that "[t]hese rules assist the court by organizing the evidence, identifying undisputed

facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence") (citation omitted).

Pursuant to Local Rule 56.1(a), a party seeking summary judgment must file with its brief a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Local Rule 56.1(a) provides that the statement of material facts must "consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Part (b) of Local Rule 56.1 requires the party opposing summary judgment to file a concise response to the movant's statement of material facts. That statement is required to include a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, "specific references to the affidavits, parts of the record, and other supporting materials relied upon." The rule is very clear that "all material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(B).

Plaintiffs failed to submit any response to defendants' Joint Statement of Undisputed Material Facts pursuant to Local Rule 56.1. As a result, the court deems admitted the supported, material facts stated therein. *See* L.R. 56.1(b)(3)(B).

Despite plaintiffs' failure to submit a response to defendants' Local Rule 56.1 statement, plaintiffs submitted a Statement of Additional Facts Pursuant to Local Rule 56.1(b). This statement, however, is fraught with factual averments that rely on hearsay and misstatements of testimony, as well as averments that are unsupported by the evidence to which they cite or that contradict their deposition testimony. As such, the court will disregard these averments in its consideration of

3

defendants' motions for summary judgment.

Rather than going paragraph by paragraph through Plaintiff's Statement of Additional Facts, ("PSF"), the court notes as examples a few of the deficiencies found in PSF. In PSF ¶ 20, plaintiffs state, "Furniture employees of United had rights and benefits related to their seniority prior to the purchase of GES in 1993," citing to exhibit 40, ¶ 9. Exhibit 40, which is the declaration of Charles Brown, ¶ 9 states, however, "As a permanent employee of United, I received benefits such as health insurance, pension contributions and paid vacations." Thus, the evidence does not support the assertion that furniture employees generally had rights and benefits, nor does it support the assertion that these employees had "rights," nor is there any mention of seniority.

Hearsay considerations aside, the record wholly lacks support for plaintiff's representation in PSF ¶ 42 that "Brown talked to Manny Kaplan and [Kaplan] said that he made payments to the union in order to keep blacks out of the union." Plaintiff cites to page 17 of Brown's deposition in support of this assertion. Nowhere in Brown's deposition testimony, however, does he say that Kaplan told him that he made payments to the union in order to keep blacks out. According to Brown's deposition, Kaplan said that he paid into the union to forestall unionizing not to unionize the furniture department. While Brown may have inferred that Kaplan's reason for his payments was to keep blacks out of the union, that is not what either Kaplan or Brown stated. Moreover, plaintiffs did not include in their PSF what Kaplan said to Brown. As such, the court will disregard PSF ¶ 42 in its consideration of defendants' motions for summary judgment.

Plaintiffs also submitted declarations in support of various asserted facts. Several of these averments of fact contradict the deposition testimony of the plaintiffs, and plaintiffs have proffered no explanation for the contradictions. *See, e.g.,* PSF ¶¶ 35, 43. "Where deposition and affidavit are

4

in conflict, the affidavit is to be disregarded unless . . . a plausible explanation for the discrepancy [is provided in the affidavit]." *Russell* v. *Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995); *see Richardson* v. *Bonds*, 860 F.2d 1427, 1433 (7th Cir. 1988) ("It is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony.") (citations omitted). The court, therefore, will not consider the facts asserted in these paragraphs.

Likewise, in PSF ¶ 46, plaintiff cites to Brown's declaration and states, "Plaintiffs were told that their employment would not be affected in any way after joining the union." Absent from this conclusional assertion is any mention of who told this to the plaintiffs, when this was said, whether the plaintiffs were all present at the same time for this discussion, or any other indication that this assertion was made on personal knowledge. Thus, the court will disregard PSF ¶ 46.

Moreover, Rule 56(e) of the Federal Rules of Civil Procedure "requires that affidavits offered in opposition to summary judgment be made on personal knowledge, . . . setting forth such facts as would be admissible in evidence, and . . . showing affirmatively that the affiant is competent to testify to the matters stated therein." *Drake* v. *Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (quotation omitted). "'Personal knowledge' includes inferences -- all knowledge is inferential -- and therefore opinions. But the inferences and opinions must be grounded in observation or other first-hand experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Vissier* v. *Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (citations omitted); *see also Toro Co.* v. *Krouse, Kern & Co.*, 827 F.2d 155, 162-63 (7th Cir. 1987) ("Statements based merely on information and belief do not satisfy the standards of Rule 56(e)."). Rule 56(e) "requires affidavits that cite specific concrete facts

5

establishing the existence of the truth of the matter asserted." *Drake*, 134 F.3d at 887 (quotation omitted). Plaintiffs failed to aver specific facts demonstrating that they had personal knowledge of the facts stated in PSF ¶ 34. Accordingly, the court will not consider the facts averred in this or other paragraphs unless plaintiffs have demonstrated that they had personal knowledge of the facts.

Defendants also failed to comply with the requirements of Local Rule 56.1. In opposing facts asserted in PSF, defendants failed to cite to the specific portion of the record that contradicts the asserted fact. *See United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried" in the record). "'Specific reference' means including proper Bluebook citations to exact pieces of the record that support the factual contention contained in the paragraph." *Malec*, 191 F.R.D. at 583. *See, e.g.,* Defendants' Joint Response to Plaintiffs' Statement of Additional Facts Pursuant to Local Rule 56.1(b) ("DR" ¶ ___) ¶¶ 21-26. In each of these paragraphs, defendants dispute the asserted fact that prior to 1993 the referenced plaintiff was a permanent warehouse employee of United assigned as a crew foreman or as a warehouseman and laborer. Defendants state that each of these statements is contradicted by the deposition of the referenced plaintiff and argue that the statement should be stricken. Nowhere, however, do defendants cite to that portion of the referenced plaintiff's deposition. As a result, defendants failed to contradict the facts asserted in these paragraphs. Additionally, defendants improperly included additional facts in many of their responses, *see, e.g.,* DR ¶¶ 21-27, 29, which the court will not consider in deciding their motions for summary judgment unless these facts also were included in defendants' Joint Statement of Undisputed Material Facts.

## FACTS

### I. Background

Each of the plaintiffs is an African-American employee of GES and a member of Local 714. GES is a tradeshow general contractor that provides the materials and labor to set-up and take-down trade shows and conventions at various hotels and convention sites around Chicago. United Exposition Services Co. ("United"), a tradeshow contractor and GES's predecessor, hired plaintiffs to work in its furniture department as furniture foremen: Charles Brown ("Brown") was hired in 1974; Billy Rockett ("Rockett") was hired in 1982; Herbert Whitehead ("Whitehead") was hired in 1983; Luther Reed ("Reed") was hired in 1988; Johnnie Rolland ("Rolland") was hired in 1985; and Clearchie Crooks ("Crooks) was hired in 1992. Although some of United's employees were represented by Local 714, none of these employees was in United's furniture department, which was not unionized. Accordingly, none of the plaintiffs was a member of Local 714 while employed by United, and none of the positions held by plaintiffs was a union position.

In May of 1993, GES acquired United. As a result of the acquisition, plaintiffs worked for GES as non-union warehouse employees at the same salary they received while employed by United. Several months later, on September 23, 1993, GES acquired another tradeshow contractor, Andrews Bartlett & Associates ("AB"). When GES acquired United and AB, it adopted the union contracts of the two companies, maintaining the existing terms and conditions of employment, including seniority rights, for the employees working under the union contracts.

### II. Union Structure at AB and United Before GES Acquisition

Before their purchase by GES, United and AB had different levels of unionization within their shops. Since 1976, Local 714 had represented all permanent AB furniture employees and

7

drivers, who were covered under separate union contracts. After AB opened a freight department in 1990, it reached an agreement with Local 714 to include the freight department in the existing bargaining unit. Pursuant to the various contracts between AB and Local 714, Local 714 also represented the referral employees employed by AB on an as-needed basis. These referral employees are also known as "classified," "casual," or "part time" employees.

AB's employees received seniority credit beginning as of the date of their employment in a bargaining unit position. As a result, the seniority list at AB was based on when the employees joined the union. Although AB employed African-Americans as "classified" employees, there were no African-American permanent employees and, accordingly, no African-American Local 714 teamsters at AB. As part of its acquisition of AB, GES agreed to hire the AB bargaining unit employees and recognized Local 714 as their exclusive representative. These employees continued to operate under their union contract as employees of GES.

By contrast, Local 714 only represented permanent employees in United's freight department, including its freight warehousemen and drivers. Local 714 did not represent United's permanent employees in any other department, including the furniture department. Other trades at United also were unionized, including United's carpenters, riggers, and electricians. All of United's union employees were Caucasian. Although some of the plaintiffs spoke with various Local 714 representatives, including Charlie Serpe, a Local 714 shop steward, and John Hardy, the head teamster at McCormick Place, in the 1970's or 1980's about joining the union, none of the plaintiffs ever spoke with a Local 714 representative, contacted Local 714 directly, or spoke with anyone at United other than their co-workers about organizing United's furniture employees. Additionally, none of the plaintiffs sought to transfer to a unionized position while employed by United.

8

After acquiring United, GES permitted United's former non-union, full-time, salaried employees to bridge their service between United and GES for purposes of non-unionized employee benefits only. This meant that GES did not treat these employees as new employees for the purpose of benefit accrual.

## III. GES Consolidates United and AB's Workforces

In early 1994, GES and Local 714 agreed to combine all unionized drivers, freight warehousemen, and furniture employees from AB and United into a single bargaining unit. As part of this process, United and AB's seniority lists were dovetailed, meaning that employees from each list were placed on a GES seniority list in the order of their respective dates of hire as reflected on the seniority lists of United and AB. This consolidation of the AB and United union employees into a single bargaining unit did not affect United's non-union furniture employees, and these non-union employees were not included on the merged seniority list.

At approximately the same time, GES agreed that the warehouse would be a union shop and that it would not permit non-union operations inside its warehouse. Accordingly, John Gilmore notified Robert Hogan that if GES wanted to assign Brown and Rockett, who were performing shipping and receiving work, to such union work, they would need to be put in the union. Within a few days, Brown and Rockett were placed in Local 714.

GES also decided to hire some of AB's former non-union employees and United's furniture warehouse employees. Like Brown and Rockett, these employees needed to join Local 714, which required that the non-union employees fill out an application, go to Human Resources, and take a drug test. In September 1994, Tom Gilmore, Vice President of National Operations for GES, John Levey, a GES manager, and Michael Joncek, GES's Facility Manager for its 44th Street facility,

9

selected the employees that GES would hire from a list of non-union employees that included former employees of both United and AB employees. The selected employees included both AB and United employees, and these employees included African-Americans and Caucasians. The drug tests taken by plaintiffs and the other non-union employees were used as a point of reference when several employees were hired on the same date. When this group of employees, including plaintiffs, completed their union dues authorization forms, Tom Gilmore informed these employees that their respective drug screening dates were their dates of hire.

Before plaintiffs and the other non-bargaining unit employees from United became bargaining unit employees, however, GES would terminate each of them because there was no bridging of prior service under the collective bargaining agreement for non-bargaining unit employees. None of the plaintiffs or other non-bargaining unit employees missed any work as a result of the "termination." Brown and Rockett joined Local 714 in February 1994, while the remaining plaintiffs did not join Local 714 until September 1994. Each of the plaintiffs took a drug test when they joined the union, and none had objections to joining. Plaintiffs and the other United furniture employees who joined Local 714 in 1994 received seniority dates that corresponded to the dates on which they became members of Local 714.

## IV.    The Collective Bargaining Agreement

The seniority provisions in the Trade Show Collective Bargaining Agreement between GES and Local 714, with an effective date of January 1, 1994 through December 31, 1996, states, in part,

> VI (1)    Seniority shall mean the relative status of an employee to other employees of the Company within the bargaining unit and shall be determined by total length of service.

> VI (2) All new employees shall be probationary employees for the first thirty (30)

days of their employment, after which they shall be given a seniority rating based on length of service from the date of employment.

VI (3) Seniority status of individual employees whose seniority had not been terminated . . . shall be calculated on the basis of the employee's original hiring date.

Additionally, Article VII (7) provides, in part, "Seniority shall prevail in all cases of layoff and rehiring, the lowest employee on the seniority roster being laid off first and rehired last." The seniority provisions of the collective bargaining agreement only applied to permanent, union employees of GES.

The practice at both United and AB was to interpret the "original hiring date" in Article VI as the date the individual became a full time employee and a member of the union. As a result, the hire date on the GES seniority list reflected the date the employee became a permanent Local 714 Teamster. Seniority was then used to determine the amount of vacation time the employees earned annually and the order of layoff and overtime distribution. As relevant here, all of the individuals higher than plaintiffs on GES's Teamster seniority list were either permanent employees at AB or permanent employees at United and members of Local 714. On February 26, 1997, Local 714's steward posted the seniority list, and everyone had an opportunity to review it.

V. **Plaintiffs' Complaints of Discrimination**

A. Grievances

In March of 1996, Brown filed a grievance that challenged his placement on the seniority list and his years of seniority credit. T.J. McGarvey denied Brown's grievance on April 8, 1996, stating that "Brown cannot claim entitlement for the years he worked as a non-bargaining unit employee." Brown received a copy of this denial at some point in 1996. The grievance was dropped in late 1996

11

by John Metz, who was then in charge of Local 714.

Rockett also filed a grievance in 1996, challenging his vacation time. McGarvey sent Rockett a response, informing Rockett that the issue was not grievable. Rockett never pursued the grievance further.

B.      National Labor Relations Board Charge

On December 19, 1997, plaintiffs filed a charge with the National Labor Relations Board ("NLRB") in which they claimed that the union failed to represent plaintiffs in handling grievances related to seniority, vacations, and lay-offs. This charge addressed plaintiffs' seniority, their placement on seniority lists, and the effects of their placement on the seniority lists. Brown later withdrew the charge because the NLRB had indicated the it would not pursue the charge because it was untimely.

C.      U.S. Department of Labor Charge

Brown and Rockett filed complaints of discrimination with the U.S. Department of Labor in December of 1997. In his complaint, Brown identified lay-offs and seniority placement as the "type of discrimination or actions taken against" him. Brown also has admitted that the issues in his complaint related back to his placement on the seniority list. Rockett's complaint alleged racial discrimination and identified lay-offs, wages, seniority, harassment, job benefits, and job assignments as the adverse job actions taken against him. Rockett has admitted as well that the allegations in his complaint were related to the 1994 seniority list.

D.      EEOC Charges

On March 5, 1998, Brown filed a charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was discriminated against because of his race when he was

denied seniority credit dating back to his hire by United in January 1976. This charge alleged

discrimination in vacation, overtime, job assignments, and layoffs, all of which were related to

Brown's February 1994 seniority date. Brown claimed that all of the areas of discrimination listed

in the charge were the result of his being placed in the union in 1994. Rockett also filed an EEOC

charge on March 5, 1998 because he believed that his placement on the seniority list behind

Caucasian employees in 1994 was discriminatory.

After completing its investigation into the charges, the EEOC issued its determination in July

of 2002. In its determination letter, the EEOC investigator stated, in part, that "the evidence

obtained in the investigation establishes reasonable cause to believe that the Respondent

discriminated against Charging Party, in violation of Title VII, as alleged." The EEOC issued a

right-to-sue letter to Brown and Rockett on March 31, 2003. Brown and Rockett filed the present

suit on their Title VII claims on June 9, 2003, within 90 days of receiving their right-to-sue letter.

## VI.    Plaintiffs' Claims of Discrimination

In the present lawsuit, plaintiffs claim that they experienced racial discrimination in the

assignment of overtime work, in their job assignments, in their lay-offs, in their loss of benefits, and

in their allotment of vacation time.[3] All of the claimed discrimination arises from plaintiffs'

placement on the seniority list in 1994, as none of the plaintiffs received credit under the collective

bargaining agreement for their employment with United or GES prior to joining Local 714. This

adversely affected the amount of vacation time that plaintiffs received, their eligibility for

---

[3]The court notes that plaintiffs failed to include any specific facts within their PSF relating to their
assignment of overtime work, their job assignments, their lay-offs, their loss of benefits, or the allotment of vacation
time. In fact, the only factual averment relating to these specific adverse employment actions is found in PSF ¶ 30,
which states, "GES did not begin to lay off workers until late 1996." Even apart from plaintiffs' failure to
authenticate exhibit 19, this averment does not establish that plaintiffs were discriminated against in their overtime
work, their job assignments, their loss of benefits, or their allotment of vacation time.

promotions, their lay-offs and rehiring, and their benefits.

Although Brown believes that he suffered racial discrimination when hired by United in 1976, he acknowledges that it was 1994 or 1995 when he was fully cognizant of the discrimination. As of 1994 or 1995, Brown was aware of his placement on the seniority list and believed that his placement on the list was discriminatory because he knew only of other African-American employees, and not Caucasian employees, whose hire dates were changed from their original date of hire by the company to the date of their union membership. Brown's seniority date is February 17, 1994, but he believes that it should have been 1976. Brown was laid of in 1996 but did not file an EEOC charge at that point.

Rockett believes that he suffered racial discrimination in 1982 when he was not permitted to join the union. He also believes that he suffered racial discrimination in 1994 when the seniority list was created. Rockett first saw the seniority list in 1994, which listed his seniority date as February 17, 1994. He believes that his seniority date should have been 1982. After seeing the seniority list for the first time, Rockett spoke to Gilmore about his placement on the list. According to Rockett, Gilmore told him that it would take an act of God to change the list. As a result, Rockett knew that his placement on the seniority list was not in error and began making complaints and requesting that his seniority date be changed.

Whitehead also believes that he encountered racial discrimination early into his employment with United in 1983 when he was not permitted to join the union. Whitehead first saw the seniority list in 1995 or 1996. At that time, he believed that he was being discriminated against because of his race. Whitehead's date on the seniority list is September 15, 1994; he believes that it should be sometime in 1985. Whitehead never filed a grievance regarding his placement on the seniority list.

14

Similarly, Reed believes that the discrimination stems from the seniority list, of which he became aware in 1995. When he first saw the list in 1995, Reed believed that it discriminated against him because of his race. Reed spoke with John Gilmore in 1995 about how the list was created, and Reed believes that the list was racially motivated. His seniority date on the list is either September 22 or 27, 1994, but Reed asserts that he should have been put into the union in 1993. Reed also believes that his 1995 lay-off was discriminatory; however, he waited until December 1997 to file a charge with the NLRB. He never filed a grievance about his placement on the seniority list.

Both Rolland and Crooks believe that they were being discriminated against because of their race in 1993 or 1994. Rolland's seniority date on the list is September 29, 1994, but he believes that it should be 1985, when he was hired by United. Crooks believes that the discrimination occurred when he was not put into the union when GES acquired United. Crooks' date on the seniority list is September 22, 1994. When he first saw the list in September 1994, Crooks' believed that his placement on that list constituted racial discrimination. Neither Rolland or Crooks filed a grievance concerning his placement on the seniority list.

## ANALYSIS

In their motions for summary judgment, defendants argue that plaintiffs' claims fail because plaintiffs' Title VII and § 1981 claims are untimely; plaintiffs cannot make out a *prima facie* case of race discrimination; plaintiffs' claims against McGarvey should be dismissed because they cannot establish that McGarvey was involved personally in any discriminatory conduct; and plaintiffs' claims are barred by § 301 of the Labor Management Relations Act and should be dismissed for plaintiffs' failure to exhaust their administrative remedies and because they are untimely. Because

15

the first argument, that plaintiffs' claims are untimely, is dispositive, the court reaches no decision

and offers no opinion as to defendants' remaining arguments.

A plaintiff may only bring a claim under Title VII if the claim is based on events that

occurred within 300 days of the plaintiff filing an EEO complaint. *See* 42 U.S.C. § 2000e-5 (Title

VII); *Hardin* v. *S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7ᵗʰ Cir. 1999) ("Under Title VII, a

plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely

charge . . . ."). Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under

Title VII. *Beamon* v. *Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7ᵗʰ Cir. 2005). For purposes

of Title VII's statute of limitations, "discrete discriminatory employment actions such as termination,

failure to promote, denial of a transfer, or refusal to hire are deemed to have been taken on the date

they occurred, even if they form part of an ongoing practice or are connected with other acts." *Id.*,

*citing Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 109-11, 122 S. Ct. 2061, 153 L. Ed. 2d

106 (2002). With regard to § 1981, the alleged discriminatory events must have occurred within four

years of the plaintiff filing suit in district court. *See Jones* v. *R.R. Donnelly & Sons Co.*, 541 U.S.

369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004).

As evidenced by plaintiffs' various admissions, the latest date on which any of the plaintiffs

was aware of his placement on the seniority list was 1996. 1996 was also the latest point in time

when any of the plaintiffs believed that his placement on the seniority list constituted racial

discrimination. Since plaintiffs did not file the present action until June 9, 2003, their Title VII and

§ 1981 claims are time-barred unless saved by the continuing violation doctrine.

Following the Supreme Court's recognition of the continuing violation theory in *United Air*

*Lines, Inc.* v. *Evans*, 431 U.S. 553, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977), the Seventh Circuit

16

identified three theories under which a plaintiff may establish a continuing violation. *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002). Under the first theory, a plaintiff may establish a continuing violation when an employer makes employment decisions over time that make it difficult for the employee to determine the actual date of discrimination. *Id., citing Jones v. Merch's Nat'l Bank & Trust Co. of Indianapolis*, 42 F.3d 1054, 1058 (7th Cir. 1994). The second theory arises when the employer maintains an express discriminatory policy. *Id., citing Stewart v. CPC Int'l, Inc.*, 679 F.2d 117, 120-21 (7th Cir. 1982). Under the third theory of a continuing violation, discrete acts of discrimination are part of an on-going pattern and at least one of the discrete acts occurred within the relevant limitations period. *Id., citing Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 396 (7th Cir. 1999); *Young v. Will County Dept. of Pub. Aid*, 882 F.2d 290, 292 (7th Cir. 1989).

It is this third theory for establishing a continuing violation that plaintiffs purport to assert to make timely their claims of discrimination. *See* Plaintiffs' Response at 9. Yet, a continuing violation of this type "is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138 at 1139 (7th Cir. 1997). This continuing violation doctrine applies to claims such as sexual harassment because duration and repetition are required to convert merely offensive behavior into an actionable change in plaintiff's working conditions. *Stepney v. Naperville School Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004), *citing Dasgupta*, 121 F.3d at 1139. In this case, by contrast, plaintiffs' loss in seniority was apparent immediately when they saw GES's seniority list. Each plaintiff also has admitted that they believed that they were being discriminated against because of their race when

17

they saw their placement on the seniority list. Brown even filed a grievance in March of 1996 to challenge his placement on the list and his years of seniority credit, which demonstrates that Brown was aware of a violation of his rights.

Additionally, each of plaintiffs' claims that they were discriminated against because of their race in their assignment of overtime work, in their job assignments, in their lay-offs, in their loss of benefits, and in their allotment of vacation time is the result of their placement on the seniority list. Yet, "an untimely Title VII suit cannot be revived by pointing to effects within limitations period of unlawful acts that occurred earlier." *Dasgupta*, 121 F.3d at 1140 (citations omitted). As explained by the Seventh Circuit, "That would make employers pay compensation for violations that were no longer actionable and would thus unravel the statute of limitations." *Id. See also Delaware State College* v. *Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980) ("The emphasis is not on the effects of earlier employment decisions; rather, it 'is [upon] whether any present *violation* exists.'"), *quoting United Airlines, Inc.*, 431 U.S. at 558 (emphasis in original). And plaintiffs have not claimed or argued that any employee on GES's seniority list with less seniority than plaintiffs was treated more favorably in the assignment of overtime work, job assignments, lay-offs, benefits, or vacation allotment independent of plaintiffs' placement on the seniority list.

Plaintiffs argue, however, that the continuing violation theory renders timely their claims because it was not clear that defendants intended to discriminate based on race until their grievances were denied, the seniority list was uncorrected, and the next round of lay-offs occurred. This argument is contrary to the law of Supreme Court and this circuit. "Under the notice rule, the 300-day limitations period commences 'at the time the [employment decision] was made and communicated to [the employee].'" *Stepney*, 392 F.3d at 240, *quoting Delaware State College*, 449

18

U.S. at 258. This period begins to run when the employee knows of the injury and not when the employee receives confirmation that the employment decision was unlawful. *Id.* at 240-241. *See also Soignier* v. *Am. Bd. of Plastic Surgery*, 92 F.3d 547 at 551-552 (7th Cir. 1996) ("[D]iscovery of the original act of discrimination, *not* future confirmation of the injury or determination that the injury is unlawful, is when the statute of limitations begins to run."), *citing Delaware State College*, 449 U.S. at 258. Accordingly, the limitations period began to run in this case no later than 1996, when plaintiffs were made aware of their placement on the seniority list. As such, plaintiffs Title VII and § 1981 claims are barred because they are untimely. The court, therefore, grants defendants' motions for summary judgment.

## ORDER

For the reasons stated above, the court grants defendants' motions for summary judgment [#80, 84]. This case is terminated.

ENTER:

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: March 31, 2006

19